**In re ERIE MARINE ENTERPRISES, INC., Debtor.**

**ERIE MARINE ENTERPRISES, INC., Plaintiff,**

v.

**ALGOMA CENTRAL MARINE, Defendant.**

**Bankruptcy No. 95–10597.**
**Adversary No. 96–1073.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Oct. 10, 1997.

Lawrence C. Bolla, Erie, PA, for Debtor.

David B. Salzman, Pittsburgh, PA, for U.S. Trustee.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Erie Marine Enterprises, Inc. ("Debtor") filed its voluntary Petition under Chapter 11

of the Bankruptcy Code on July 20, 1995. On October 2, 1996, Debtor filed the within Complaint against Algoma Central Marine ("Algoma") to compel turnover of property of the estate pursuant to 11 U.S.C. § 542, or, in the alternative, to avoid certain fraudulent transfers pursuant to 11 U.S.C. § 548 and/or the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5101–5110. Presently before the Court is Algoma's Motion for Summary Judgment. The Debtor opposes the Motion.

Algoma initially raised an issue of deficiency of service of process which it has withdrawn having been satisfied that service was proper. Algoma also raises the issue of lack of personal jurisdiction, alleging that it does not have sufficient minimum contacts with the State of Pennsylvania to warrant personal jurisdiction. We find that we have personal jurisdiction over Algoma and that the Motion for Summary Judgment must be granted.

### Personal Jurisdiction

■ It is clear that Algoma has sufficient minimum contacts with Pennsylvania to warrant the exercise of personal jurisdiction. Prior to commencement of the business relationship between the Debtor and Algoma, representatives of Algoma visited the Debtor's facility in Erie. Following the visit, Algoma delivered two ships to Erie for repair in the summer of 1994. Two additional ships were delivered to Erie for repair during the winter of 1994–95. Representatives of Algoma made periodic visits to Erie while the work was ongoing. Donald Larkin, a naval architect employed by Algoma made numerous trips to Erie to observe the Debtor's performance and to monitor the progress of the work which the Debtor had contracted to perform for Algoma.

In response to an interrogatory asking Algoma to identify in detail any contacts or dealings in Pennsylvania during the last ten years, Algoma responded that "on occasion,

prior to 1992, Defendant (Algoma) believes that it may have delivered Canadian salt, sand and stone into the Port of Erie."

We find that there are sufficient minimum contacts with Pennsylvania[1] to warrant the exercise of personal jurisdiction over Algoma for the purpose of this litigation.

### Undisputed Facts

Algoma operates shipping vessels which it charters to carriers of bulk freight. Debtor operated a dry dock in Erie, Pennsylvania to service and repair shipping vessels. In the winter of 1994–95, Algoma sent two ships to the Debtor for service and repair, the Algosteel and the John B. Aird.

No dispute exists between the parties as to the work performed or payment for the work on the Algosteel. This action relates to payment for services provided by the Debtor on the John B. Aird.

Upon completion of the work on the John B. Aird, Debtor sent invoices dated April 25, 1995 to Algoma which totalled $1,682,687. Algoma disputed the amount of the invoices and a meeting was held between representatives of both Algoma and the Debtor in an attempt to resolve the dispute.

After the meeting, Debtor provided revised invoices (also dated April 25, 1995) to Algoma in the amount of $1,113,723 reflecting a reduction of $569,144 from the original invoices. The revised invoices were accompanied by a cover letter dated April 27, 1995 from the Debtor's General Manager to Algoma which provides:

> As a result of our meeting this week, enclosed are the revised invoices for the M/V John B. Aird. These are not final invoices as there are three issues that remain unresolved. The first issue which we do not seem to be able to meet on common ground is the inner bottom repairs which were based on time and material rates. The other two issues are the services in support of tank repairs and the overtime

---

**1.** Some courts hold that when dealing with a Federal Bankruptcy question, it is appropriate to look at the defendant's contacts with the United States rather than the forum state in which the court is sitting. *In re Schwinn Bicycle Co.,* 192 B.R. 461 (Bankr.N.D.Ill.1996) (and cases cited therein). We need not decide that issue as we find that Algoma has sufficient minimum contacts with the Commonwealth of Pennsylvania.

premium. Both of these items were specifically identified in our bid as additional charges not included in the quote. . . .

Upon receipt of the revised invoices and cover letter, Algoma sent a letter dated May 1, 1995 which indicated that it would pay the full amount of $1,113,723 only as a final payment and if that was not acceptable to the Debtor, it would only pay $1,033,273 and hold back $80,450 pending final resolution of all outstanding issues.

Thereafter, the Vice President of Algoma was contacted by the President of the Debtor who agreed to accept the amount of the revised invoices as final payment.[2]

Once Debtor's President agreed to accept the amounts shown on the revised invoices as payment in full, Algoma tendered payment in the amount of $1,113,723 which was accepted by the Debtor.

### Issues

1. Whether the actions of the Debtor and Algoma formed a binding accord and satisfaction.

2. Whether an accord and satisfaction is a defense to a fraudulent transfer action.

3. Whether Debtor, in making the settlement, received reasonably equivalent value for the release of its claims, and whether the settlement was concluded with an intent to hinder, delay, and defraud Debtor's creditors.

### Discussion

### Accord and Satisfaction

■■■ Debtor agrees that Algoma has accurately set forth Pennsylvania law with regard to the elements of an accord and satisfaction as follows:

The elements of an accord and satisfaction are (i) a disputed debt, (ii) a clear and unequivocal offer of payment in full satisfaction of the debt, and acceptance and retention of payment by the offeree. *Goodway Marketing, Inc. v. Faulkner Advertising Associates, Inc.*, 545 F.Supp. 263, 266 (E.D.Pa.1982). The Pennsylvania Supreme Court has held that when a claim is subject to a dispute over the amount due an offer to pay any portion of the claim as payment in full for the whole disputed claim is valid consideration. *See Cohen v. Sabin*, 452 Pa. 447, 307 A.2d 845 (1973); *Williston on Contracts* § 7:35 (4th ed.1992). The debtor's offer of a settlement amount in full and final settlement and the creditor's acceptance of that amount constitute the offer and acceptance of an accord and satisfaction. The consideration is the resolution of an unliquidated or disputed claim. *Occidental Chemical Corporation v. Environmental Liners, Inc.*, 859 F.Supp. 791 (E.D.Pa.1994); *Hayden v. Coddington*, 169 Pa.Super. 174, 82 A.2d 285 (1951).

■■■ All of the necessary elements are present. There was a valid dispute over the cost of the repairs to the John B. Aird. After the work was completed, Debtor invoiced Algoma for $1,682,687. A meeting between Algoma and the Debtor took place in an attempt to resolve the dispute. Following the meeting, Debtor issued revised invoices in a reduced amount while it indicated that it wanted to reserve three issues for further discussion.

Upon receipt of the revised invoices, Algoma made a clear and unequivocal offer that it would pay the full amount of the revised invoices only if the Debtor would agree to accept that amount as final payment. In response, Debtor's President agreed that the amount of the revised invoices would be ac-

---

**2.** This fact is set forth in the Affidavit of Timothy Dool and the deposition of Jack Kinnear. While the Debtor has not agreed that the Debtor's President agreed to accept $1,113,723 as payment in full, its response has not indicated anything to the contrary. Once a motion for summary judgment is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegation or denials

in its pleadings. Rather, its response must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Debtor has come forward with no evidence which would even tend to indicate that the Debtor's President did not make such an agreement.

ceptable as full payment. Based on that agreement, Algoma paid and the Debtor accepted the amount of $1,113,723.

Accordingly, we find that the elements of an accord and satisfaction have been met.

### Accord and Satisfaction as a Defense to Fraudulent Conveyance Action

■ The Debtor asserts that even if there was an accord and satisfaction, we must ultimately decide whether the write-off was undertaken with fraudulent intent and/or was for less than reasonably equivalent value for the purposes of the within action and that an accord and satisfaction is not a defense to a fraudulent transfer action. We agree.

11 U.S.C. § 548(a)(2)(A) provides that a fraudulent conveyance has occurred (assuming other elements are present) if the Debtor makes a transfer and "received less than a reasonably equivalent value in exchange." Pennsylvania law has a similar provision at 12 Pa.C.S.A. § 5104.

The Debtor asserts that the extra money received by the Debtor in the settlement is so disproportionate to the claims which the Debtor thereby released, that the money cannot stand as a "reasonably equivalent value," so that the settlement must be avoided as a fraudulent conveyance.

■ We have a duty to analyze the settlement between the parties to ensure that reasonably equivalent value exchanged. *In re FBN Food Services, Inc.*, 175 B.R. 671, 689 (Bankr.N.D.Ill.1994). A transferee of a fraudulent conveyance cannot hide behind an agreement which in fact defrauds creditors. *Id.* at 682. The existence of a fair exchange must be determined from the perspective of creditors rather than from the vantage point of the debtor. *Mellon Bank, NA. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir.1991); *Interpool Ltd. v. Patterson,* 890 F.Supp. 259 (S.D.N.Y.1995).

We conclude that even though there was an accord and satisfaction, we must examine the settlement to determine whether the $80,450 the Debtor received constituted reasonably equivalent value for the claims which it released and whether the write–off was taken with fraudulent intent.

### Reasonably Equivalent Value

■ While we must necessarily look at the underlying settlement to ensure that it was equitable, and thus that reasonably equivalent value or fair consideration was exchanged by each side to the settlement, we need not look in great detail to determine its worth. As stated in *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379 (Bankr.E.D.Pa.1988):

There is no question that the compromise of a dispute can supply the element of consideration in a contract. *See e.g., North American Properties, Ltd. v. Pocono Farms Lot Owners Ass'n.*, 489 F.Supp. 452, 458–59 (M.D.Pa.1980); *Shipley v. Pittsburgh & L.E.R. Co.*, 83 F.Supp. 722, 762 (W.D.Pa.1949); *Cohen v. Sabin,* 452 Pa. 447, 453–54, 307 A.2d 845, 849 (1973); and *Hensel v. Cahill,* 179 Pa.Super. 114, 118–19, 116 A.2d 99, 101 (1955). While it is true that a totally groundless claim or a non-dispute may not constitute consideration, *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 391–92, 123 A.2d 663, 665 (1956); and *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285, 199 A. 139, 141 (1938), the courts will not look at the underlying merits of a compromise very critically to determine its worth. "The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question." *Shipley, supra,* 83 F.Supp. at 762.

*Id.* at 389.

We need only determine whether the settlement was in the range of a reasonable measure of the value of the Debtor's services. *In re Shapiro,* 124 B.R. 974 (Bankr.E.D.Pa. 1991).

■ The within matter involved substantial disputes on both sides.

Debtor's quote for work on the John B. Arid states that overtime is not included. Debtor's initial invoices included substantial amounts for overtime services. Algoma alleged that it never authorized overtime and therefore in accordance with industry standards, charges to it for overtime are inappro-

priate. Debtor asserted that Algoma was aware of the overtime and did not object and at one point near completion of the job, recommended that overtime continue. Algoma's response was that it understood that the Debtor was working overtime to make up for inefficiencies in its performance, but Algoma never authorized and was not aware that it would be charged for the overtime hours.

Algoma also disputed the invoice amounts on the basis that they were at variance with the quotation and that there were overcharges for additional work performed. Algoma alleged discrepancies in per pound charges for steel and that the Debtor's lack of skilled workers resulted in mistakes and unsatisfactory workmanship and excessive time being spent on individual tasks. Debtor acknowledges that some reduction was appropriate due to lack of productivity. Debtor had a difficult time getting enough workers to complete the job, and the workers it did get were temporary, inexperienced and had to climb the learning curve which resulted in low efficiency.

Debtor alleged that the quote did not include mud removal, temporary services and inner–bottom repairs. In response, Algoma asserted that additional charges had to be approved prior to completion of the work.

Algoma alleged that Debtor charged for excessive lay days and that completion of the work was some 25 days late due to Debtor's inefficiencies. Debtor alleged that lateness was due to the expanded scope of the work.

The parties entered into an arm's–length negotiation which resulted in a settlement.

The claim of $1,682,827 was settled for $1,113,723, a difference of $569,104. Algoma essentially admitted liability for $1,033,273 (Letter of May 1, 1995, Algoma per Jack D. Kinnear to Steve Miley of Erie Marine). By that letter, Kinnear would recommend payment of $1,033,273 if the disputed items were left open, or he would recommend payment of $1,113,723 to settle all matters. Algoma was paying $80,450 to settle the $569,104 in disputed items. While Algoma's payment of $80,450 is only 14% of the disputed portion of the claim, the payment was substantial; it cannot be said to be insubstantial, frivolous or meaningless. The settlement agreement was therefore complete and binding. The fact, if it were proven, that it was a poor settlement would not change the result. Nor would the result change if it were shown that the Debtor's chief executive officer was, at the moment of agreement on the settlement, motivated more by a desire for immediate cash than the long term benefit of the Debtor. Debtor could have accepted Algoma's offer of $1,033,273 in cash, while leaving open the disputed items. Debtor chose the extra cash in hand of $80,450.

This result is not only in accord with Pennsylvania law, but is an example of its theory and practical application. When a party gives up hard cash, which he can never get back, in consummating a settlement of a disputed claim, the settlement is binding and ought not be upset in the absence of compelling circumstances. Settlement of the numerous issues was the product of arm's–length bargaining and not of fraud or collusion. Algoma felt it paid the Debtor more than it was entitled to for the number of lay days and for bulk head work, while Debtor felt it was underpaid for mud removal, overtime, and temporary service charges.

Having apprised ourselves of the underlying facts, we find that the compromise was supported by sufficient consideration to make it binding, and that the Debtor received reasonably equivalent value for the release of its contested claims.

### Intentional Fraud

Debtor pleads in its Complaint that the writing off and/or reduction of the balance due and owing by Algoma for repair work was made with actual intent to hinder, delay or defraud the Debtor's then existing and future creditors. The record lacks any facts which would support a claim that there was any intent to perpetrate a fraudulent conveyance.

### Conclusion

The Motion for Summary Judgment filed by Algoma will be granted and the within Complaint dismissed.